The next case is James Doyle v. United States, 2023, 1734, 1735. Mr. Marzullo. Mr. Marzullo, are you with us? Thank you, Your Honor. Good morning. May it please the Court. Roger Marzullo appearing on behalf of Mr. Doyle. The error in the trial court's decision was to fail to properly apply the de facto finality rule announced by the Supreme Court in Pactel v. City and County of San Francisco. We ask that the Court there for reverse and remand for further proceedings. In Pactel, the Supreme Court held that the Ninth Circuit had erroneously affirmed a dismissal on grounds that the landowner had failed to pursue an exemption from existing regulatory requirements. And the Supreme Court observed that those requirements mirrored its exhaustion of remedies requirements in the context of administrative remedies. What the Supreme Court said is that fundamentally the Court needs to know how the regulations apply to the property in question. The focus then is not on what remedies may be available to the plaintiff, but rather how the regulations apply to the property. Now, the trial court looked at those cases and properly announced or recited the decisions in Pactel and in Nick v. Township of Scott, on which it relied. But the trial court then jumped to a conclusion that does not follow that rule. The trial court's conclusion was that there was one and only one way in which Mr. Doyle could ripen his claim. And that was to file an incidental take permit with Fish and Wildlife Service and have it denied. In fact, he chided Mr. Doyle for, in his words, spending 25 years without having ever filed for an incidental take permit. Well, first of all, factually, that is incorrect. Mr. Marzullo, how – it seems that you concede under Pactel there'd have to be no question about how the regulations of that issue apply to the particular land in question here in order for you to have a ripe claim. Is that right? That is a phrase from the Court. Yes, Your Honor. I think no question could be a little misleading, I suppose. Do we ever have no question about anything? All right. But yes, that is the quote. Okay. Presumably it's not metaphysical certainty. I get that. But how else could someone in Mr. Doyle's position, in your view, establish that there is no question without giving the service here what it says it needs in order to make a complex, multifactor analysis as to whether or not to give him the permit that he needs? Well, excellent question, Your Honor. As I was suggesting, first of all, in the early 1990s, Mr. Doyle did exactly that. And as the government's brief points out, he spent $140,000 preparing a habitat conservation plan, preparing an application for an incidental take permit, and he filed them. And they were rejected. The trial court apparently didn't realize that because the trial court says he didn't. Beyond that, the focus here is on what actually has happened, and that's what the trial court ignored. I think there are five facts that the trial court improperly ignored and thus didn't have an understanding of how the regulations affect this property. First of all, it's designated as critical habitat for the Mojave Desert tortoise. Critical habitat is a statutorily defined term which says this land is essential to the conservation of the species. Secondly, Congress designated about 62,000 acres, including Mr. Doyle's land, as the Red Cliffs Conservation Area. And Congress directed the Secretary of Interior that she shall manage this property to conserve, protect, and enhance its natural conditions. Third, the Fish and Wildlife Service itself, in issuing an incidental take permit for most of Washington County, Utah, covering about 129,000 acres, and balancing all of the issues, all of the kinds of factors that Your Honor is talking about, and I'll reach out in just a moment, issued this unusual incidental take permit that covers a great deal of property in the county, including Mr. Doyle's. And it placed Mr. Doyle's property in the so-called Zone 3, which is the highest value tortoise habitat. That Washington County permit expressly contemplates landowners, even within Zone 3, making their own incidental take permit applications. It does not, per se, prevent Mr. Doyle from being granted exactly what he says he wants. Actually, Your Honor, I don't think that's quite what it says. The government quotes the fact that under the no surprises discussion, which is a policy that the Interior Department won't come up with new requirements, once incidental take permit issues. It says, well, you, the landowners who are governed by this permit, should be aware that someone could apply for an incidental take permit, and in that case, what would happen? Well, because the requirements of Section 10 of the Endangered Species Act are that there be adequate mitigation for any development. If one person gets development rights, another person has to give them up. So that is the impact on the no surprises factor that the incidental take permit talks about. And as I said, it classifies all of this 129,000 acres as either developable, not developable. And Zone 3 is the least developable. It is characterized as the core of the entire conservation project. And to our knowledge, no development has ever been approved within Zone 3. It is a conservation area. Fourth, the fourth factor, if I may go on, is that from day one, the anticipation was that the United States, the Bureau of Land Management in the name of the United States, would acquire title to all of the 62,000 acres that were being managed as the conservation area, the Red Cliffs Conservation Area. In the original incidental take permit that was issued in 1996, there is described a then pending super exchange under which title was to be acquired by exchanging all of the private holdings within this conservation area for developable land in Nevada, in the Las Vegas area, that had been declared excess. Well, for one reason or another, that super exchange did not go through. Congress did not pass the necessary legislation. And so the private landowners were left holding the bag, so to speak, being governed by the various restrictions, but not having developable land exchanged. What BLM promised is we will seek appropriations to purchase your property. It remains our intent, and I believe it remains their intent today, to purchase title, to acquire title to all of the property, so that we can manage this as a single conservation area for the benefit of the Mojave Desert tortoise and for the other conservation values that the Red Cliffs Reserve allows. And finally, if I get to number five, fact number five, the BLM has in fact managed the entire area as though it already owned the property. And that includes fencing in the areas where the tortoises are most prevalent with this special tortoise fencing that keeps them from digging under the fence. Obviously, they don't jump over it, but they do tend to tunnel under it. So if you want to look at the land. Counsel, you're discussing a lot of aspects of this case, but it's very simple that he didn't apply for the proper permit, and the case is therefore not ripe. That was the losing argument in Packnell, Your Honor. That is the exhaustion of remedies requirement that the Supreme Court said does not apply in a taking case, where the only question is, are there present regulations on the plaintiff's property? Which may or may not constitute a taking. We haven't reached that issue. But are there regulations currently applicable to the plaintiff's property? Or is this a hypothetical question, something that has not yet occurred? In the footnote 118 in our brief, we cite the Otay Mesa case out of the D.C. Circuit, in which the D.C. Circuit held merely designating property as critical habitat. It imposes an entry restriction. Counsel, can I ask you a question? Oh, sure. You're talking about Nick and Packnell, but I'm reading both of them as being limited to Section 1983 actions, and specifically whether a plaintiff alleging a regulatory taking must pursue an inverse condemnation case in a state court under that statutory provision, which is not at issue in this case. So tell me, why am I wrong in thinking that those cases don't apply here, where it's a taking under the Tucker Act, and not a taking under Section 1983? Yes. The holding is not limited to Section 1983, Your Honor, looking first at the Nick case, because that's kind of the foundational one here. Under the case that it overruled, Williamson County, the Supreme Court had held that the landowner must exhaust efforts to obtain just compensation before making a Federal claim that just compensation had been denied. That case that it overruled was a Section 1983 case, right? It was, Your Honor. But the discussion, and if you look at Nick, there actually is a discussion of the Tucker Act and how under the Tucker Act in this Court, a taking occurs at the time that the regulations are imposed. And the Court uses that to show that the taking does not occur after an individual has completed administrative processes, sought a permit or an exemption, but rather at the time the regulation is imposed. And the Court then takes that Tucker Act holding, or discussion rather, and says this also applies to Section 1983, which after all, and it applies, Your Honor, not in all Section 1983 cases, which is any violation of civil rights, but only in taking cases. It is a holding specific to how the Fifth Amendment applies. It applies to States and localities the same way that it applies to the United States. Counsel, your rebuttal time is mostly gone. I assume you want to save it? I do. Thank you, Your Honor. Mr. Anderson. Good morning, Your Honors. May it please the Court. Christopher Anderson from the United States. I think I'd like to begin by pointing out that the United States does not disagree that practical finality is sufficient to ripen a takings claim. But as my colleague points out, for there to be practical finality, there must be no question as to the Supreme Court's term as to how the regulations will apply to the property at issue. And in this case, there are numerous questions as to what development may be permitted on Mr. Doyle's land and what mitigation measures may be required. We are not arguing that Mr. Doyle needs to apply for a permit for the sake of seeking a permit. We're arguing that he needs to apply for a permit so that the service can exercise its discretion to answer those questions. I think it's important to distinguish the holding in Pactel from this case. Pactel involved a situation in which there were essentially no administrative remedies left open to the plaintiff. And the Ninth Circuit more or less said that they had lost their takings claim by not timely seeking those administrative remedies, and the Supreme Court said that's wrong. That's not the case here. The Fish and Wildlife Service has full discretion to issue Mr. Doyle an incidental take permit should he apply for one. That process remains open and available to him. With regard to Nick, Nick, as you point out, is a 1983 case. And what Nick overruled only one of Williamson County's two holdings. Williamson County held first that in a 1983 takings action, plaintiffs must exhaust state law remedies. But then it went on to discuss the finality requirement. And if you read the Supreme Court's decision in Nick, it explicitly says we are overruling the state law exhaustion requirement. We are not touching the finality requirement. And were that not the case, they would have had to address all of the Supreme Court's finality jurisprudence subsequent to Williamson County, and they didn't. So Nick does not support Mr. Doyle in this case. So you agree to the no questions standard, and you've asserted there are plenty of questions. Give us a couple of examples of what questions remain open. Well, so for example, Your Honor, the incidental take permit application that Mr. Doyle filed doesn't even explain what he proposes to do on the property. All it says is that he proposes a low-density development of three development units per acre, totaling 799 developments. The service needs to know a lot more about what that development might look like so it can assess what the impacts might be on the tortoise, whether there are alternatives that need to be considered, and most importantly, what mitigation measures might be necessary. Is there an open question as to whether any type of residential development can be permitted on his property, given what we've heard is Zone 3, and it's in Red Cliffs, a conservation area, and it's essential? Is it really an open question about whether he can do any kind of development? There is, Your Honor, and I can address all of those points separately, but I think the most important thing that you pointed out, the Washington County permit by its terms does not apply to any private landholdings if the private landowner does not choose to participate in it, and the Habitat Conservation Plan does contemplate that private in-holders could be granted their own incidental take permits. And there is no limitation on what that could be, provided that the requirements of the Endangered Species Act are met and that it's possible to mitigate impacts that may be inevitable from the development. The Fish and Wildlife Service believes that that may be possible, but the Fish and Wildlife Service can't determine that for certain until it has a detailed development plan and until it has a mitigation proposal. And those are questions that just can't be prejudged at this point. If I can touch briefly on the five points my colleague made, as far as critical habitat goes, the designation of land as critical habitat does not of its own force impose any limitation on the use of that land. What it does is it requires a federal agency issuing a permit, which includes an incidental take permit, to ensure that that federal action will not adversely affect the critical habitat. But importantly, under Fish and Wildlife Service regulations, when the service makes that determination, it evaluates the critical habitat as a whole, not any particular piece of habitat. So there are 129,000 acres of critical habitat for the tortoise here. Mr. Doyle, at the time of the complaint, owned, he alleges, 115 acres. That's less than one-tenth of one percent. When considering a development proposal in the context of critical habitat as a whole, it is not obvious that adverse impacts to one-tenth of one percent of critical habitat can't be authorized. As far as the Red Cliffs National Conservation Area goes, I would just point to the statute, 16 U.S.C. 460 WWW, paragraph D. The only land in the conservation area is federal land. The statute does provide, as my colleague says, that additional land may be acquired and incorporated into the reserve, but the restrictions on the reserve only apply to public land. They do not apply to private in-holdings within the reserve boundaries. Talking about the permit, it is true that BLM would like to acquire all of the land in the reserve. BLM is continuing to do that. In fact, since the time of the complaint, BLM has acquired additional portions of Mr. Doyle's property. I believe, based on information that was given by BLM, that his holdings within the conservation area are down to about 60 acres. BLM does that on a willing buyer, willing seller basis, as and when appropriations become available. It is continuing to try to do that. But the fact that BLM wants to acquire the property doesn't affect the service's ability to issue an incidental take permit. In fact, the service could not consider that because that's not one of the statutory factors in the Endangered Species Act that the service is permitted to consider. And the Endangered Species Act factors, if those factors are met, the service must issue the permit. The service doesn't have discretion to not issue a permit because it doesn't want to if an applicant otherwise meets the factors. And the last thing I would just say on the assertion that BLM is managing the property, there is a complicated management structure for this area that includes the state, BLM, Washington County, to implement the habitat conservation plan that's part of Washington County's permit. Yes, there is fencing. The allegations about what specific fencing is of concern here are not very well developed in the complaint. We don't know that it's even federal fencing. But putting all of that aside, those actions reflect the state of affairs as they exist today. Should Mr. Doyle apply for an incidental take permit, should he meet the ESA's factors, should the service issue him that permit, all things which are entirely possible, then that management structure would adjust to account for that. And there are provisions in the habitat conservation plan that provide for that and other mechanisms to adjust that. If I can talk about the fencing for just a second. I had originally read Mr. Doyle's opening brief to state a claim for a physical taking. Based on statements in the reply brief, it appears that that's not what's being pressed, that the fencing was only brought up as evidence that an incidental take permit could not be issued as a practical matter. But for much the same reasons that he failed to state a physical taking based on fencing, that doesn't support the argument that there's practical finality here because fences can be reconfigured if necessary to accommodate development. What about his no surprises point? He suggests, if I understand it correctly, you'll never grant him a permit because it would mean taking developmental rights away from somebody else. Sure. So that's not correct. Should he apply for a permit, that would have to be evaluated on the basis of his property. And under both the Act and Fish and Wildlife Services regulations, to get that permit, he would have to mitigate the effects on the tortoise. That requirement stems from the fact of where his land is, not from any provision in the Washington County permit because where his land is is a place that is important to the tortoises. But if the permit were issued, it would mean that he had implemented the necessary or committed to implementing the necessary mitigation, which would necessarily offset the loss of mitigation in Washington County's permit. And that's in effect what the Habitat Conservation Plan provision, which is at Appendix 430, contemplates. And then that contemplates that should that happen, there would be some effort to coordinate the mitigation measures of the various parties so that they work together to protect the tortoise. Thank you, counsel. Thank you. We would ask that the Court of Federal Claims be affirmed. As we've often said, no one loses points for not using up all their time. Mr. Mazzullo has two minutes for rebuttal. Thank you, Your Honor. And I think I have maybe three points. The first is there's no mitigation land available anymore after all these years that the government hasn't either acquired or that wasn't government land in the first place. So to mitigate for disturbing tortoise habitat, Mr. Doyle would have to find that from someone else. And that's what I meant when I said it would mean a reshuffling of the entire plan for the entire county, most of which has been built out now. Second, we disagree with government's suggestion that Packdale has application only in situations where the landowner has let the time run on his remedy and they don't have it anymore. And the Supreme Court said, oh, well, in that case, your case is right. Packdale talked about how they don't, that it might actually affect the damages that Packdale had failed to pursue his remedy. But the main point was he doesn't have to pursue an exemption if otherwise his property is now regulated. Third, I guess to touch briefly on the nature of an incidental take permit, because I think it's not entirely clear from the way the government has presented it, it's not a building permit. The Endangered Species Act prohibits any harm, any person causing any harm or injury to the species. An incidental take permit says we will not prosecute you for harming a species if you do what we say. That is, in this case, if you construct according to our plans, if they indeed allow that construction. And that's what the countywide permit did here. It took the whole county and it set up, as counsel said, this federal state committee that reviews every development proposal and so forth and so on. And finally, my final point is the trial court mistakenly believed that Mr. Doyle had never filed an incidental take permit application. He did in the early 1990s. It was denied. Why does that not satisfy even the standard that the trial court set forth as requiring him to file an incidental take permit application? Thank you, Your Honor. Thank you to both counsel. The case is submitted.